FLAUM, Circuit Judge.
In 2011, the Wisconsin Legislature passed Act 10, a budget repair bill proposed by recently elected Governor Scott Walker. Act 10 significantly altered the state’s public employee labor laws, creating two distinct classes of public employees—a select group of “public safety employees” with the remainder classified as “general employees.” Among other things, the Act prohibited general employees from collectively bargaining on issues other than “base wages,” imposed rigorous recertification requirements on them, and prohibited their employers from deducting union dues from paychecks. The Act did not, however, subject public safety employees or their unions to the same requirements; they kept the same rights they had under the pre-Act 10 scheme. The proposal and subsequent enactment of Act 10 was controversial and received nationwide publicity. See Wis. Right to Life State Political Action Comm. v. Barland, 664 F.3d 139, 144-45 (7th Cir.2011).
Plaintiffs and cross-appellants, representing seven of Wisconsin’s largest public sector unions (the “Unions”), filed suit against defendants-appellants Governor Scott Walker and other state actors, challenging three provisions of the statute— the limitations on collective bargaining, the recertification requirements, and a prohibition on payroll deduction of dues—under the Equal Protection Clause. They also challenged the payroll deduction provision under the First Amendment. The district court invalidated Act 10’s recertification and payroll deduction provisions, but upheld the statute’s limitation on collective bargaining. We now uphold Act 10 in its entirety.
I. Background
A. Factual Background
Wisconsin grants public sector employees the right to bargain collectively through two principal labor laws—the Municipal Employment Relations Act (“MERA”) and the State Employee Labor Relations Act (“SELRA”)—that define the rights of employees and unions as well as their relationship with governmental employers. Act 10 amended these statutes, imposing new burdens on a group labeled “general employees.” 2011-2012 Wis. Legis. Serv. 29 (West). Unions representing “public safety employees,” however, continued operating under the pre-Act 10 scheme. Proposal and enactment of Act 10 triggered widespread protest from Wisconsin’s public sector labor unions, including the Unions’ challenge to the constitutionality of certain provisions of Act 10.
1. Act 10 Creates Two Categories of Public Employees
All of the Unions’ constitutional claims arise from the legislature’s decision to subject general employees but not public safety employees to Act 10’s restrictions on union activity. All employees governed by MERA and SELRA are “general employees” unless specifically identified as “public safety employees” in Act 10. In creating this distinct group, the Act cross-references seven of the twenty-two occupations *643 listed in a separate statute, which governs the Wisconsin Public Employee Trust Fund. See Wis. Stat. § 40.02(48)(am). Under SELRA, Act 10 identifies state troopers and state motor vehicle inspectors as public safety employees. Wis. Stat. § 111.81(15r). Act 10 did not, however, identify the Capitol Police and the University of Wisconsin Police as public safety employees, even though both occupations qualified as such under the trust fund statute. Compare Wis. Stat. § 40.02(48)(am), ivith Wis. Stat. § 111.81(15r). Act 10’s list of public safety employees under MERA is somewhat longer, including (1) police officers, (2) fire fighters, (3) deputy sheriffs, (4) county traffic police officers, and (5) village employees that perform fire or police protection. Wis. Stat. § 111.70(l)(mm).
Notably relevant to the arguments in this appeal, when Governor Walker ran for election in 2010, only five public employee organizations endorsed his candidacy during the campaign: (1) the Wisconsin Troopers Association, which represents state troopers and motor vehicle inspectors; (2) the Milwaukee Police Association; (3) the Milwaukee Professional Fire Fighters Association; (4) the West Allis Professional Police Association; and (5) the Wisconsin Sheriffs and Deputy Sheriffs Association Political Action Committee. Each of these organizations represents employees categorized as public safety employees under Act 10. The public safety employee definition, however, also includes employee organizations that opposed or failed to endorse the governor. For instance, all state, municipal, and village police officers and firefighters qualify as public safety employees even though only those in Milwaukee and police officers in West Allis endorsed Walker. In addition, the Professional Firefighters of Wisconsin[1] and the Wisconsin Professional Police Association endorsed Walker’s opponent. And the head of the Madison firefighters’ union called for a general strike in response to Act 10, despite its employees’ public safety classification.
2. Unions Challenge Three Parts of Act 10
The Unions challenge three different parts of Act 10: (1) limitations on the permissible collective bargaining subjects of general employees; (2) stricter recertification requirements for general employee unions; and (3) a prohibition on the payroll deduction of union dues for general employees.
First, prior to Act 10, MERA and SELRA permitted public employees to collectively bargain over a broad array of subjects including their wages and conditions of employment. Moreover, these unions could negotiate “fair-share” agreements, which require employees opting out of union membership to pay “their proportionate share of the cost of the collective bargaining process and contract administration.” See Wis. Stat. § 111.81(9). Act 10, however, limits general employee unions to the single topic of the “total base wages and excludes any other compensation.” Wis. Stat. §§ 111.70(l)(a), (4)(mb), 111.81(1), 111.91(3). It also forbids fair-share agreements. Wis. Stat. §§ 111.70(2), 111.845.
Next, MERA and SELRA formerly permitted municipal or state employees to petition the Wisconsin Employment Relations Commission to hold an election to select a particular union as the employees’ exclusive bargaining agent. Certification *644 required a simple majority. Once certified, the union remained the employees’ exclusive agent until thirty percent of the employees petitioned for a decertification election. That election required a simple majority to certify a union as the exclusive collective bargaining representative. Act 10, on the other hand, requires general employee unions to submit to an annual “recertification” election in which an absolute majority—“at least 51 percent of the votes of all of the general ... employees in the collective bargaining unit” (not just those voting)—must approve the union to retain its status as the employees’ agent. Wis. Stat. § 111.70(4)(d)3.b., 111.83(3)(b).
Third, under a separate statute, Wisconsin permitted state employees to allow their employer to deduct a portion of their salaries for “[pjayment of dues to employe[e] organizations,” including unions. Municipalities could do likewise, provided that they extended the opportunity to all employee organizations with members in the particular unit. See Milwaukee Fed’n of Teachers Local 252 v. Wis. Emp. Relations Comm’n, 83 Wis.2d 588, 266 N.W.2d 314 (1978). Act 10 prohibits all payroll deductions for general employees. Wis. Stat. § 20.921(l)(a)2.
B. Procedural Background
The Unions filed suit in federal district court alleging that all three provisions violated the Equal Protection Clause because of the Act’s differential treatment of public safety and general employees. They also claimed that the prohibition on payroll deductions for general employees violated the First Amendment on several grounds, including that the payroll deduction prohibition targeted employees who had not endorsed or otherwise politically supported Governor Walker when he ran for office in 2010.
1. General Employees Move to Intervene
Several municipal employees (the “Employees”) moved to intervene in defense of Act 10. See Fed.R.Civ.P. 24(a). They were not members of the union, but pre-Act 10 law required them to pay union expenses under a fair-share agreement. After Act 10, the Employees were classified as general employees and thus no longer responsible for these dues.
2. Motion for Summary Judgment
The state moved for judgment on the pleadings, Fed.R.Civ.P. 12(c), and the Unions cross-moved for summary judgment on all claims, Fed.R.Civ.P. 56. Because the facts in the case are undisputed, the district court considered the motions together. The court also considered the Employees’ motion to intervene.
The district court applied rational basis review to the equal protection claims and upheld the limitation on general employee collective bargaining. Wis. Educ. Ass’n Council v. Walker, 824 F.Supp.2d 856 (W.D.Wis.2012). It found a rational basis in the state’s belief that applying Act 10 to public safety employees might result in a retaliatory strike that jeopardized the public welfare. A similar strike by the general employees, the state believed, would be less damaging. Id. at 866-68. However, the district court found no rational basis for treating the two groups differently with respect to the recertification and payroll deduction provisions. Id. at 868-70. It further concluded that the payroll deduction provision violated the First Amendment because the court determined that the differing political viewpoints of, and endorsements by, employees in the two classifications were the only possible justifications for Act 10’s prohibition on payroll deductions for general employees. Id. at 870-76. Consequently, the district *645 court invalidated these portions of Act 10 and enjoined the state from enforcing the recertification and payroll deduction provisions. Defendants now appeal the recerti-fication and payroll deduction judgment, while the Unions cross-appeal the adverse collective bargaining ruling.
The district court also denied the Employees’ motion to intervene, concluding that their unique interest in the litigation was only “tangential” and that the state could adequately represent their interests. Id. at 860-61. Employees now appeal the denial of this motion to intervene.
II. Discussion
We review a district court’s ruling on summary judgment de novo, making all inferences of fact in favor of the non-moving party. Bennett v. Roberts, 295 F.3d 687, 694 (7th Cir.2002). We apply the same standard of review to a district court’s ruling on a motion for judgment on the pleadings. ProLink Holdings Corp. v. Fed. Ins. Co., 688 F.3d 828, 830 (7th Cir. 2012).
A. Act 10 Does Not Violate the First Amendment
Act 10’s payroll deduction prohibitions do not violate the First Amendment. The Unions offer several different First Amendment theories to rebut the compelling deference of rational basis review required under applicable law. Ultimately, none apply because the Supreme Court has settled the question: use of the state’s payroll systems to collect union dues is a state subsidy of speech that requires only viewpoint neutrality. See Ysursa v. Pocatello Educ. Ass’n, 555 U.S. 353, 358-59, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009); see also Regan v. Taxation with Representation, 461 U.S. 540, 548, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). Admittedly, the Unions do offer some evidence of viewpoint discrimination in the words of then-Senate Majority Leader Scott Fitzgerald suggesting Act 10, by limiting unions’ fundraising capacity, would make it more difficult for President Obama to carry Wisconsin in the 2012 presidential election. While Senator Fitzgerald’s statement may not reflect the highest of intentions, his sentiments do not invalidate an otherwise constitutional, viewpoint neutral law. Consequently, Act 10’s prohibition on payroll dues deduction does not violate the First Amendment.
1. Use of the State’s Payroll System to Collect Union Dues Subsidizes— Rather than Burdens—Speech
The Bill of Rights enshrines negative liberties. It directs what government may not do to its citizens, rather than what it must do for them. See Smith v. City of Chi., 457 F.3d 643, 655-56 (7th Cir.2006). While the First Amendment prohibits “placing] obstacles in the path” of speech, Regan, 461 U.S. at 549, 103 S.Ct. 1997 (citation omitted), nothing requires government to “assist others in funding the expression of particular ideas, including political ones,” Ysursa, 555 U.S. at 358, 129 S.Ct. 1093; see also Harris v. McRae, 448 U.S. 297, 318, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (noting that Constitution “does not confer an entitlement to such funds as may be necessary to realize all the advantages of’ a constitutional right). Thus, even though “publicly administered payroll deductions for political purposes can enhance the unions’ exercise of First Amendment rights, [states are] under no obligation to aid the unions in their political activities.” Ysursa, 555 U.S. at 359, 129 S.Ct. 1093.
In Ysursa, the Supreme Court squarely held that the use of a state payroll system to collect union dues from public sector employees is a state subsidy of speech. Id. As the Court explained, “the State’s decision not to [allow payroll deduction of union dues] is not an abridgment of the *646 unions’ speech; they are free to engage in such speech as they see fit.” Id. Other circuits have reached the same conclusion. See Utah Educ. Ass’n v. Shurtleff, 565 F.3d 1226, 1229-31 (10th Cir.2009); Toledo Area AFL-CIO Council v. Pizza, 154 F.3d 307, 319-21 (6th Cir.1998); S. Car. Educ. Ass’n v. Campbell, 883 F.2d 1251, 1256-57 (4th Cir.1989); Brown v. Alexander, 718 F.2d 1417, 1422-23 (6th Cir.1983); Ark. State Highioay Emps. Local 1315 v. Kell, 628 F.2d 1099, 1102 (8th Cir.1980). Like the statutes in these cases, Act 10 places no limitations on the speech of general employee unions, which may continue speaking on any topic or subject. Thus, Ysursa controls, and we analyze Act 10 under the Supreme Court’s speech subsidy cases.
The Unions try to distinguish Ysursa by noting that the prohibition in Ysursa applied across-the-board to unions representing all public employees, unlike Act 10’s prohibition targeting only general employees. Thus, the Unions argue, unlike the subsidy in Ysursa, Act 10 actively imposes burdens on the speech of unions representing general employees. Indeed, two recent district court cases have relied on precisely this argument to distinguish Ysursa in finding First Amendment problems with payroll deduction statutes similar to Act 10. See Bailey v. Callaghan, 873 F.Supp.2d 879, 885-86 (E.D.Mich.2012); United Food & Commercial Workers Local 99 v. Brewer, 817 F.Supp.2d 1118, 1125 (D.Ariz.2011).
But the Unions’ reasoning falters for two reasons: Act 10 erects no barrier to speech, and speaker-based discrimination is permissible when the state subsidizes speech. First, the prohibition on payroll deductions for general employees does not erect a barrier to the Unions’ speech. As the district court here recognized, Act 10 diminishes speech only because it diminishes “the union’s ability to fund its speech.” Walker, 824 F.Supp.2d at 871. Thus, the “obstacle” to speech here is the cost of speaking, an obstacle the state itself has not created. And while the state may not erect “obstacles in the path of [the unions’] exercise of ... freedom of speech, it need not remove those [obstacles] not of its own creation.” Regan, 461 U.S. at 549-50, 103 S.Ct. 1997 (quoting Harris, 448 U.S. at 316, 100 S.Ct. 2671) (original brackets omitted); see also Campbell, 883 F.2d at 1257 (“The state’s failure to authorize payroll deductions for the [union] does not deny [union] members the right to associate, to speak, to publish, to recruit members, or to otherwise express and disseminate their views.”); Brown, 718 F.2d at 1423 (same). Importantly, Act 10 does not present a situation where the state itself actively erected an obstacle to speech.[2] Thus, nothing supports treating the selective prohibition of payroll deductions as a burden on or obstacle to the speech of general employee unions. Instead, Act 10 simply subsidizes the speech of one group, while refraining from doing so for another.
Second, such speaker-based distinctions are permissible when the state subsidizes speech. Nothing in the Constitutior requires the government to subsidize all speech equally. A government subsidy "that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas.' Leathers v. Medlock, 499 U.S. 439, 450, 111
*647 S.Ct. 1438, 113 L.Ed.2d 494 (1991); see also Nat’l Endowment for the Arts v. Finley, 524 U.S. 569, 587-88, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (noting legislatures “may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech ... at stake” and that such funding is not “discrimination] on the basis of viewpoint [but] ... merely ... funding] one activity to the exclusion of the other” (citation omitted)). As Regan explained, legislative “selection of particular entities or persons for entitlement to this sort of largesse is obviously a matter of policy and discretion not [ordinarily] open to judicial review[.]” 461 U.S. at 549, 103 S.Ct. 1997 (internal quotations omitted). Indeed, the speech subsidy upheld in Regan discriminated on the basis of speaker—veterans’ groups who engaged in lobbying could claim section 501(c)(3) status but other lobbying groups could not. Id. at 548-49, 103 S.Ct. 1997; see also Campbell, 883 F.2d at 1255-56 (no First Amendment implications to statute that discriminated on the basis of speaker in authorizing payroll deduction for some public employee organizations but not others). Thus, that the state gave one category of public employees the benefit of payroll dues deduction does not run afoul of the First Amendment.
Unable to distinguish Act 10 from Ysur-sa and the Court’s other speech subsidy cases, the Unions also liken the state’s payroll deduction system to a nonpublic forum.[3] See, e.g., Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 830, 834, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (applying nonpublic forum analysis to a student activities fund used to reimburse the expressive activity of student organizations, noting that the fund was a “forum more in a metaphysical than a spatial or geographic sense”). But applying Rosenberger to this case would require us to ignore Ysursa, where the Supreme Court settled this question: it evaluated state-imposed restrictions on a union’s use of state payroll systems under subsidy cases like Regan, rather than under Ro-senberger ’s nonpublic forum framework. 555 U.S. at 359, 129 S.Ct. 1093 (citing Regan, 461 U.S. at 549, 103 S.Ct. 1997); but see also Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 544, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (noting in a subsidy case that certain “limited forum cases ... may not be controlling in a strict sense, yet they do provide some instruction”).[4] In fact, the Unions cite no case applying nonpublic forum analysis to a state payroll system, and this Court is not aware of any. Other circuits likewise have consistently evaluated state payroll deductions as speech subsidies. See Shurtleff, 565 F.3d at 1229-31; Pizza, 154 F.3d at 319-21; Campbell, 883 F.2d at 1256-57; Brown, *648 718 F.2d at 1422-23; Kell, 628 F.2d at 1102.
Thus, Ysursa requires us to analyze Act 10 under First Amendment cases involving speech subsidies. Under those cases, Act 10 presents no free speech problem unless it invidiously discriminates on the basis of viewpoint.
2. Act 10 Does Not Invidiously Discriminate on the Basis of Viewpoint
While the First Amendment does not require government to subsidize all speech equally, it does proscribe subsidies that discriminate on the basis of viewpoint. Regan, 461 U.S. at 548, 103 S.Ct. 1997; see also Ysursa, 555 U.S. at 359, 129 S.Ct. 1093; Rosenberger, 515 U.S. at 834, 115 S.Ct. 2510. Act 10, however, is viewpoint neutral because it is neither facially discriminatory nor a neutral fagade for viewpoint discrimination.
a. Act 10 Is, on Its Face, Viewpoint Neutral
On its face, Act 10 is neutral—it does not tie public employees’ use of the state’s payroll system to speech on any particular viewpoint. See Velazquez, 531 U.S. at 546-48, 121 S.Ct. 1043 (speech subsidy viewpoint discriminatory when conditioned on recipient advancing particular viewpoint). Nevertheless, the Unions argue that Act 10 facially discriminates on the basis of viewpoint because general employee unions and public safety unions will necessarily espouse different viewpoints. Maybe they do. But this argument merely recycles the Unions’ earlier assertion that speaker-based discrimination in the subsidy context requires heightened scrutiny. It does not. See Regan, 461 U.S. at 549-50, 103 S.Ct. 1997 (citing Harris, 448 U.S. at 316, 100 S.Ct. 2671). The eases cited by the Unions, which invalidated laws discriminating on the basis of speaker, confirm this principle. Each one—unlike Act 10—involved a law that actively created barriers to speech rather than mere subsidies. For example, Citizens United v. FEC involved a law that prohibited speech by forbidding certain speakers from spending money, akin to prohibiting speech altogether. 558 U.S. 310, 130 S.Ct. 876, 896-97, 175 L.Ed.2d 753 (2010). Similarly, the statute in Sorrell v. IMS Health, Inc.—like that in Citizens United—actually prevented pharmaceutical manufactures from engaging in certain types of commercial speech. — U.S. -, 131 S.Ct. 2653, 2663, 180 L.Ed.2d 544 (2012).[5] While Sor-rell and Citizens United support the unconstitutionality of speaker-based discrimination in statutes that prohibit or burden speech, Regan controls on government subsidies of speech: speaker-based distinctions are permissible. Regan, 461 U.S. at 548-49, 103 S.Ct. 1997.
The mere fact that, in practice, the two categories of unions may express different viewpoints does not render Act 10 viewpoint discriminatory. The two groups here are no more likely to express different viewpoints (and the government subsidy no more likely to advantage a particular viewpoint) than the speaker-based distinction sanctioned in Regan. In that case, the advantaged group, veterans’ organiza *649 tions, undoubtedly held different viewpoints than those excluded from the subsidy; yet, the Court upheld the statute. Id. at 550-51, 103 S.Ct. 1997. Indeed, the Unions’ argument proves too much: if different speakers necessarily espouse different viewpoints, then any selective legislative funding decision would violate the First Amendment as viewpoint discriminatory. Such an interpretation of the First Amendment would leave legislatures with the unpalatable choice of funding all expressive activity or none at all.
Retreating somewhat from the argument that public safety and general employee unions necessarily espouse different viewpoints, the Unions next argue that the public safety/general employee distinction is “likely” to have a viewpoint discriminatory effect. See Southworth v. Bd. of Regents of the Univ. of Wis. Sys., 307 F.3d 566, 593-94 (7th Cir.2002); Chi. Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 699-700 (7th Cir.1998). The courts in both Southworth and Chicago Acorn applied a nonpublic forum analysis to invalidate facially neutral policies that had the effect of viewpoint discrimination. Southworth, 307 F.3d at 593-94; Chi. Acorn, 150 F.3d at 699-700. In both cases, however, this effect inhered in the policy classification itself. The Chicago Acorn regulation, for example, waived rental fees for applicants who might generate favorable publicity. 150 F.3d at 699. This criterion, however, would inherently produce a discriminatory effect: “As applied to political applicants ..., a favorable-publicity criterion is especially likely to have political consequences, since the only political users of the pier who will generate large amounts of favorable publicity are respectable, popular politicians and respected, well-established political groups; pariahs need not apply.” Id. at 699 (emphasis omitted). So too in Southworth, which involved two funding standards for student activities grants. One standard favored student organizations that had previously received funding; the other favored long-established organizations. 307 F.3d at 593. Because political and religious groups had previously been excluded from receiving funding, these two standards inherently disadvantaged religious and politically partisan viewpoints. Id. at 593-94. Unlike the classifications in Chicago Acorn and Southworth, however, Act 10’s public safety and general employee distinction has no inherent connection to a particular viewpoint. In short, in Chicago Acorn and Southworth, a causal connection existed between the classifications and the discriminatory effect. In contrast, the connection between the classification in Act 10 and the Unions’ perceived discriminatory effect is merely coincidental: a particular union’s political views do not inhere in its status as a public safety union.[6] Consequently, the Unions’ reliance on Chicago Acorn and Southworth is misplaced.
The distinction between public safety and general employee unions in Act 10 is facially neutral, and the Unions do not succeed in showing otherwise. Thus, we next consider whether Act 10 is a fagade for invidious discrimination.
b. Act 10 Is Not a Fagade for Invidious Discrimination
Because Act 10 itself does not facially discriminate on the basis of viewpoint, the Unions raise three other arguments suggesting that Act 10 presents a facially neutral fagade for invidious viewpoint discrimination. These arguments require peering past the text of the statute to infer *650 some invidious legislative intention. We decline this invitation.[7] First, the Unions rely on the correlation between particular unions’ political endorsements of Governor Walker and the unions’ statuses as public safety unions. Second, the Unions argue that Act 10 is underinclusive in a way that makes it “a mere pretext for an invidious motive.” See Ridley v. Mass. Bay Trans. Auth., 390 F.3d 65, 86 (1st Cir.2004). Finally, the Unions look to the statements of a particular legislator to find an invidious intent to discriminate.
The correlation between political endorsements and access to the payroll system does not render Act 10 viewpoint discriminatory. That the benefits of Act 10’s subsidy may fall more heavily on groups with one particular viewpoint does not transform a facially neutral statute into a discriminatory one. In Hill v. Colorado, for example, a statute prohibited people from approaching within eight feet of any other person outside a healthcare facility for purposes of any oral protest, education, or counseling. 530 U.S. 703, 709-10, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). According to the Court, the statute was neither content—nor viewpoint-based, even though the legislative history made “clear” that protests near abortion clinics “primarily motivated” the statute and its burdens would fall disproportionately on the speech of those protestors.[8] Id. at 715, 120 S.Ct. 2480. Indeed, the Supreme Court has made clear that a policy is not “vulnerable to constitutional assault ... because it systematically and predictably burdens most heavily those groups whose viewpoints are out of favor with the ... mainstream.” Christian Legal Soc’y v. Martinez, — U.S. -, 130 S.Ct. 2971, 2994, 177 L.Ed.2d 838 (2010); see also Madsen v. Women’s Health Ctr., Inc., 512 U.S. 753, 763, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (“[T]he fact that the injunction covered people with a particular viewpoint does not *651 itself render the injunction content or viewpoint based.”); Pilsen Neighbors Cmty. Council v. Netsch, 960 F.2d 676, 688 & n. 9 (7th Cir.1992) (noting “plaintiffs were denied access into the program because of their status, not because of their views”). Act 10 is no different—that it disproportionately impacts groups with one particular viewpoint does not transform its facially neutral language into an invidiously discriminatory statute. Moreover, as a factual matter, the public safety category includes several unions that did not endorse Governor Walker—for example, none of the municipal police and firefighters unions, except those in Milwaukee and West Allis, endorsed Governor Walker.
Nor does the Unions’ underinclusivity argument fare any better. According to the Unions, Act 10 is underinclusive because several occupations that ensure public safety were omitted from the definition of “public safety employees.” This under-inclusivity, the Unions argue, presents a facially neutral fagade concealing “a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people.” City of Ladue v. Gilleo, 512 U.S. 43, 51, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (internal quotations omitted); see also Ridley, 390 F.3d at 86 (underinclusive regulations can suggest “viewpoint discrimination is afoot”). The district court seemingly agreed, concluding that “the only apparent reason for discriminating between the [two types of unions] is their different viewpoints.” Walker, 824 F.Supp.2d at 876 (emphasis omitted). Indeed, the Supreme Court has, on occasion, expressed reservations about underinclusive regulations of speech. In City of Ladue, the Court did recognize that “the notion that a regulation of speech may be impermissibly underin-clusive is firmly grounded in basic First Amendment principles,” and that “through the combined operation of a general speech restriction and its exemptions, the government might seek to select the permissible subjects for public debate and thereby to control ... the search for political truth.” 512 U.S. at 51, 114 S.Ct. 2038 (emphasis in original) (internal quotations omitted).[9] Likewise, Brown v. Entertainment Merchants Ass’n explained that “[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.” — U.S. -, 131 S.Ct. 2729, 2740, 180 L.Ed.2d 708 (2011).
Neither case applies here, though. First, in City of Ladue, the Court worried only about underinclusivity driven by content discrimination. Thus, the First Amendment does not forbid all underinclu-sivity but only underinclusivity that “restricts too little speech because [the law’s] exemptions discriminate on the basis of the signs’ messages.” 512 U.S. at 51, 114 S.Ct. 2038 (emphasis added). Only content-based or viewpoint-based exemptions implicate the concerns voiced in City of Ladue. The Court re-affirmed this view in R.A.V. v. City of St. Paul, explaining that “the First Amendment imposes not an ‘under-inclusiveness’ limitation but a ‘content discrimination’ limitation upon a State’s prohibition of proseribable speech.” 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). As explained above, Act 10 contains no content- or viewpoint-discriminatory exemption. Instead, its exemption differentiates on the basis of speaker with *652 out reference to whatever viewpoint that speaker may hold. Brown does not alter this conclusion; in that case, the Court relied on underinclusivity when determining whether the statute was narrowly tailored so as to survive strict scrutiny. 131 S.Ct. at 2738. Moreover, as the district court recognized, both of these cases involved active prohibitions on speech. Neither involved the situation in this case, where the state merely declines to subsidize speech.
Left with a facially viewpoint neutral state subsidy of speech, both the Unions and the district court ultimately rely on the floor statements of Senator Fitzgerald, who, rising in support of Act 10, explained “[i]f we win this battle, and the money is not there under the auspices of the unions, certainly what you’re going to find is President Obama is going to have a ... much more difficult time getting elected and winning the state of Wisconsin.” Walker, 824 F.Supp.2d at 876 n. 17. This singular comment, however overtly partisan, reveals little of the intent of the legislature as a whole when it enacted Act 10 or the governor when he introduced it. See United States v. O’Brien, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (noting “[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it”). The Supreme Court has recognized as much. O’Brien refused to infer discriminatory intent from the floor statements of three congressmen, explaining that courts should not “strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.” Id. at 383-86, 88 S.Ct. 1673. Likewise, Hill declined to do precisely that, explaining that “the contention that a statute is ‘viewpoint based’ simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support.” 530 U.S. at 724, 120 S.Ct. 2480. Indeed, in Hill the legislative record showed that legislators passed the statute primarily to address pro-life speech outside abortion clinics, yet Hill nevertheless found the statute content neutral. Id. at 715, 120 S.Ct. 2480; see also id. at 724-25, 120 S.Ct. 2480 (noting anti-picketing ordinance in Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), held content neutral though “obviously enacted in response to the activities of antiabortion protesters”). And in Campbell, the Fourth Circuit refused the invitation to review the legislative record for evidence of discriminatory intent when the legislature permitted some unions to use payroll deductions but prohibited another union from doing so. 883 F.2d at 1260-62. In any event, we have insufficient basis to ascribe Senator Fitzgerald’s personal position to the entire legislature.[10]
At bottom, the use of the state payroll system to collect union dues is a state subsidy of speech. As such, the distinction between public safety and general employees only violates the First Amendment if it discriminates on the basis of viewpoint. Because we conclude that Act 10 is not viewpoint discriminatory, it does not impli *653 cate the First Amendment and requires only rational basis review.
B. Act 10’s Provisions Survive Rational Basis Review
The parties necessarily agree that rational basis review governs the Unions’ equal protection claims because Act 10 neither affects a “fundamental right[] nor proceed[s] along suspect lines.” Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Under this standard, a law avoids constitutional scrutiny as long as it bears a rational relationship to a legitimate government interest. Id. at 320, 113 S.Ct. 2637; Smith, 457 F.3d at 652. Importantly, we do not require the state to “actually articulate” the law’s purpose or “produce evidence to sustain the rationality” of the classification. Heller, 509 U.S. at 320, 113 S.Ct. 2637; see Univ. Prof'ls of Ill., Local 4100 v. Edgar, 114 F.3d 665, 667 (7th Cir.1997). Instead, the law is presumed constitutional, and we impose a weighty burden on the Unions— they must “negative every ... basis which might support” the law because we will uphold it “if there is any reasonably conceivable state of facts” supporting the classification. Heller, 509 U.S. at 320, 113 S.Ct. 2637; see Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S.Ct. 461, 99 L.Ed. 563 (1955). This basis need not be in the record so long as it finds “some footing in the realities of the subject addressed by the legislation.” Heller, 509 U.S. at 321, 113 S.Ct. 2637.
Wisconsin was free to impose any of Act 10’s restrictions on all unions. See Ysursa, 555 U.S. at 359, 129 S.Ct. 1093 (across-the-board payroll deduction limitations survive rational basis review); Smith v. Ark. State Highway Emps., Local 1315, 441 U.S. 463, 464-65, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam) (no right to collective bargaining in general); see also Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 287, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984) (stating, in the context of collective bargaining, “[w]hen government makes general policy, it is under no greater constitutional obligation to listen to any specifically affected class”). The Unions instead challenge as irrational the division of public safety and general employees under the Equal Protection Clause. They apparently recognize that distinguishing certain unions that perform crucial tasks survives rational basis review, but they emphatically argue that the way Wisconsin divided the two groups is irrational. According to the Unions, the only explanation for the legislation is the extension of “rank political favoritism” towards the unions that supported the governor’s campaign. Specifically, they argue that understanding why Wisconsin classified state motor vehicle inspectors as public safety employees but classified prison guards, the University of Wisconsin Police, and the Capitol Police as general employees requires “the exercise of strained imagination.”
In doing so, the Unions invite us to speculate about the legislature’s motive, at least in cases, they argue, where the distinctions between the two classes are “so disconnected” from a proffered purpose and “so closely connected” to an illegitimate purpose. This argument has ostensible appeal, but it is unsupported by our case law. Indeed, under rational basis review, we cannot search for the legislature’s motive. See O’Brien, 391 U.S. at 383, 88 S.Ct. 1673 (“It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.”). All that matters is whether the statute, as written, furthers a legitimate government objective. Once we find a “rational relationship between the disparity of treatment and some legitimate governmental purpose,” the act passes constitutional scrutiny. *654 Srail v. Vill. of Lisle, 588 F.3d 940, 946 (7th Cir.2009). For our purposes, animus only invalidates a law when no rational basis exists. Flying J Inc. v. City of New Haven, 549 F.3d 538, 546 (7th Cir.2008) (holding “[ajnimus comes into play only when [there is] no rational reason or motive ... for the injurious action taken by the [legislature]”).
The Unions’ reliance on U.S. Department of Agriculture v. Moreno does not support their position that animus is relevant to our inquiry. 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973). In Moreno, Congress amended the requirements for receiving food stamps to exclude groups of unrelated people living together, sharing common cooking facilities, and purchasing food in common. Id. at 530, 93 S.Ct. 2821. The Supreme Court noted that Congress apparently attempted to exclude “hippies” from fraudulently benefitting from the system. Id. at 534, 93 S.Ct. 2821. The Court rejected the Government’s contention that Congress could rationally conclude that unrelated people living together were more likely to abuse the system because fraudulent hippies could simply alter their living arrangements by using separate kitchens or purchasing food individually, while unrelated households truly in need of the program would lack the financial resources to make such an arrangement. Id. at 535-38, 93 S.Ct. 2821. The Court concluded that Congress’s classification wholly failed to further the government’s interest because those that abused the system would continue to do so and those that Congress intended to help would not—-the amendment neither furthered the program’s original purpose of benefiting needy families nor limited the fraud perpetrated by non-needy, unrelated people living together. See id. at 538, 93 S.Ct. 2821. Viewing Moreno in this manner makes the case no different than any other rational basis case. Where, as in Moreno, an act furthers no legitimate government interest, it fails rational basis review. Moreno is not a case, as the Unions urge, where the Court suggested a statute would have passed rational basis review but for animus towards a particular group.
As unfortunate as it may be, political favoritism is a frequent aspect of legislative action. We said as much in Hearne v. Board of Education, 185 F.3d 770, 775 (7th Cir.1999). There, members of the Chicago Teachers Union challenged on various constitutional grounds, including the Equal Protection Clause, an act of the Republican-dominated legislature that severely curtailed Chicago teachers’ job security relative to teachers in other parts of the state. Id. at 773. The unions argued, in part, that the Republican legislature retaliated against them for opposing Republicans in the previous election. Id. We candidly remarked, “there is no rule whereby legislation that otherwise passes the proper level of scrutiny ... becomes constitutionally defective because one of the reasons the legislators voted for it was to punish those who opposed them during an election campaign.” Id. at 775. We went further stating, “[i]ndeed one might think that this is what election campaigns are all about: candidates run a certain platform, political promises made in the campaign are kept (sometimes), and the winners get to write the laws.” Id. These sorts of decisions are left for the next election. Accordingly, we must resist the temptation to search for the legislature’s motivation for the Act’s classifications. We now turn to the three challenged provisions.
1. Collective Bargaining Limitations
Wisconsin is correct that the collective bargaining limitations constitutionally promote flexibility in state and local government budgets by providing public employers more leverage in negotiations. This alone, however, is not enough to save *655 the provision because the differential treatment of public safety and general employee unions must also be rational. On this point, the district court upheld the classifications because Wisconsin could rationally believe that Act 10’s passage would result in widespread labor unrest, but also conclude that the state could not withstand that unrest with respect to public safety employees.
We agree that Wisconsin reasonably concluded that the public safety employees filled too critical a role to risk such a stoppage. Not only has the Supreme Court previously held labor peace in certain instances is a legitimate state interest, the Court found the interest weighty enough to justify some impingement on the free speech rights of employees who do not belong to a union. See Ellis v. Bhd. of Ry. Clerks, 466 U.S. 435, 455-56, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984); see also Knox v. Serv. Emps. Int'l Union, Local 1000, - U.S. -, 132 S.Ct. 2277, 2290, 183 L.Ed.2d 281 (2012) (describing “labor peace” as justification for public sector fair-share agreements). And experience has borne out the state’s fears: in the wake of Act 10’s proposal and passage, thousands descended on the state capital in protest and numerous teachers organized a sick-out through their unions, forcing schools to close, while the state avoided the large societal cost of immediate labor unrest among public safety employees. Wisconsin was free to determine that the costs of potential labor unrest exceeded the benefits of restricting the public safety unions.
This conclusion is uncontroversial: other courts have upheld distinctions between employee groups with similar classifications. See, e.g., Am. Fed’n of Gov’t Emps. v. Loy, 281 F.Supp.2d 59, 65-66 (D.D.C. 2003) (constitutional to prohibit TSA airport screeners from collectively bargaining but permit other TSA employees to do so), aff'd, 367 F.3d 932 (D.C.Cir.2004); Margiotta v. Kaye, 283 F.Supp.2d 857, 864-65 (E.D.N.Y.2003) (constitutional to eliminate compulsory arbitration for court security officers but not other police officers). Indeed, when pressed at oral argument, the Unions’ counsel acknowledged that the state could draw rational distinctions between public safety and general employees for this purpose. However, the Unions contend the way in which Wisconsin separated the two groups negates the legitimacy of the classifications. Fundamentally, they argue Wisconsin should have either classified motor vehicle inspectors as general employees or placed prison guards, the University of Wisconsin Police, and the Capitol Police in the public safety group.
The Supreme Court has continually rejected this sort of argument, stating “[d]e-fining the class of persons subject to a regulatory requirement ... requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line ... [and this] is a matter for legislative, rather than judicial, consideration.” FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 315— 16, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (internal quotations). Thus, in Village of Belle Terre v. Boraas, the Court upheld a zoning regulation that permitted two unrelated people to live together but prohibited three or more of them from doing so because such arrangements are more likely to constitute boarding or fraternity houses that nuisance neighbors. 416 U.S. 1, 2, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). In doing so, the Court implicitly acknowledged that many of the forbidden households would not cause nuisances and were indistinguishable from permitted arrangements, but the Court refused to invalidate the ordinance because “every line drawn by a legislature leaves some out that might well have been included.” Id. at 8, 94 S.Ct. 1536. Similarly, in Vance v. Bradley, *656 the Court upheld a statute that required individuals in the Foreign Service system to retire at age sixty but permitted employees covered by the Civil Service to retire at age seventy. 440 U.S. 93, 96, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). The government justified the legislation on the need for a more rapid system of promotions and turnover in the Foreign Service system because youth was more important for the rigors of overseas service. Id. at 98-99, 106, 99 S.Ct. 939. The Court acknowledged the law was simultaneously overinclusive and underinclusive because the stated goals applied to many Civil Service jobs and did not apply to certain Foreign Service positions. For instance, only sixty percent of Foreign Service officers served overseas, while five percent of Civil Service officers did. Id. at 107, 99 S.Ct. 939. Nevertheless, the statute easily withstood rational basis review because “perfection is by no means required” and the “provision does not offend the Constitution simply because the classification is not made with mathematical nicety.” Id. at 108, 99 S.Ct. 939 (internal quotations).
Thus, we cannot, as the Unions request, determine precisely which occupations would jeopardize public safety with a strike. Even if we accept that Wisconsin imprudently characterized motor vehicle inspectors as public safety employees or the' Capitol Police as general employees, invalidating the legislation on that ground would elevate the judiciary to the impermissible role of supra-legislature. The judiciary’s refusal to take on this role explains why, applying rational basis review in City of New Orleans v. Dukes, the Supreme Court hypothesized reasons for upholding the preferential treatment of pushcart vendors that worked for longer than eight years even without a showing that they were more qualified than newer vendors. 427 U.S. 297, 298, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam). Further, it explains why the Court, in Lee Optical, upheld a law allowing only ophthalmologists and optometrists to install prescription eye lenses, even though opticians possessed similar skills. 348 U.S. at 486, 490-91, 75 S.Ct. 461. Distinguishing between public safety unions and general employee unions may have been a poor choice, but it is not unconstitutional.[11]
2. recertification requirements
Many of the justifications for the collective bargaining limitation also apply to the recertification requirement. As we mentioned, Act 10 exhibits a rational belief that public sector unions are too costly for the state. The recertification process furthers this interest by imposing a recertification burden that impacts unions’ influence over employees who are less passionate about union representation. The Unions characterize this voting rule as arcane, but the alternative to Act 10 would appear to be the outright elimination of all general employee unions. Instead, the legislature enacted a law which presumes *657 that when many employees abstain from a recertification election, those employees are, at best, unenthusiastie about the union’s representation. In such cases, it is permissible for Wisconsin to rationally conclude that the union is not worth maintaining through an automatic recertification process—or, at least, Wisconsin does not want to incur the cost of unions which have uncommitted members.
Because the state clearly has an interest in the recertification requirement, the rational basis for applying it only to general employees flows from the justification for differentially applying the collective bargaining limits. The provision may tend to weaken unions, and Wisconsin rationally feared backlash—either immediate or eventual (in the event a public safety union later failed to garner recertification support)—if it applied the provision to the public safety unions. The Unions raise the same sorts of arguments against this provision that they did against the collective bargaining provision—that it was irrational to include the motor vehicle inspectors but exclude safety-related unions like the Capitol Police. For the reasons in the previous section, these arguments are unavailing.
3. Payroll Deduction Prohibition
As we explained in Part U.A., because the payroll deduction prohibition does not implicate the First Amendment, we analyze this provision under rational basis review.[12] Wisconsin could have rationally eliminated all payroll deductions. Ysursa, 555 U.S. at 359, 129 S.Ct. 1093
(noting that “the State is not constitutionally obligated to provide payroll deductions at all”). And, as was the case with the other provisions, Wisconsin’s differential treatment of general and public safety unions is supported by its concern for labor peace among the public safety employees. The Unions again rely on the alleged “gerrymandering” of the public safety employee definition to challenge the State’s justifications for Act 10. But these arguments fail for the same reasons stated above— such line—drawing is not for the courts.
The Unions also label as “wholly implausible” the legislature’s fear that a payroll prohibition on public safety employees would trigger an illegal strike. But rational basis review does not require the state to “produce evidence to sustain the rationality” of the law, provided the law has “some footing in the realities of the subject addressed by the legislation.” Heller, 509 U.S. at 320-21,113 S.Ct. 2637. The state’s fear is rational, particularly considering the controversy surrounding passage of Act 10 and the Unions’ own admission before the district court that the effect of the payroll prohibition would be “catastrophic.” Consequently, the payroll dues prohibition survives rational basis review.
C. The District Court Did Not Err in Denying Proposed Intervenors’ Motion to Intervene
The Employees filed a motion to intervene as of right in support of the state.[13] See Fed.R.Civ.P. 24(a)(2). A party has a right to intervene when: (1) the *658 motion to intervene is timely filed; (2) the proposed intervenors possess an interest related to the subject matter of the action; (3) disposition of the action threatens to impair that interest; and (4) the named parties inadequately represent that interest. Ligas ex rel. Foster v. Maram, 478 F.3d 771, 773 (7th Cir.2007). The Unions oppose intervention and challenge only two of these elements: the relationship between the Employees’ interest and the subject-matter of the suit, and the adequacy of the state in representing the Employees’ interests. This Court applies de novo review to the district court’s determination on these two elements, id., neither of which the Employees satisfy.
1. Direct and Substantial Interest
Intervention as of right requires a “direct, significante,] and legally protectable” interest in the question at issue in the lawsuit. Keith v. Daley, 764 F.2d 1265, 1268 (7th Cir.1985). That interest must be unique to the proposed intervenor. Id. Moreover, the question of “[w]hether an applicant has an interest sufficient to warrant intervention as a matter of right is a highly fact-specific determination, making comparison to other cases of limited value.” Sec. Ins. Co. of Hartford v. Schipporeit, Inc., 69 F.3d 1377, 1381 (7th Cir. 1995).
The Employees assert they have a First Amendment interest in not paying compulsory union fees and in rejecting the union as their state-imposed bargaining agent. However, the Employees largely acknowledge that Abood v. Detroit Board of Education and its progeny settle this question. 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). There, the Court held that a public sector union could recover expenses related to collective bargaining from nonmembers even though they could not force nonmembers to fund political or ideological union projects. Id. at 234, 97 S.Ct. 1782. Although this payment “significant[ly] impinge[s] on First Amendment rights” of nonmember employees, the governmental interest in “industrial peace” justifies this intrusion on free speech. Ellis, 466 U.S. at 455-56, 104 S.Ct. 1883; see also Knox, 132 S.Ct. at 2290 (describing “labor peace” as justification for public sector fair-share agreements). Thus, under Abood and Ellis, the state could properly compel the Employees to pay union charges under fair-share agreements, precisely as it did before passage of Act 10.
The Employees do not dispute any of this, nor do they assert any constitutional right allowing them to escape payment of the union expenses that Abood and its progeny have allowed. Instead, they argue that Act 10 “changes the constitutional calculus” underlying this First Amendment analysis. According to the Employees, when the state passed Act 10, it abolished “industrial peace” as a compelling interest that justified the First Amendment concerns of dissenting employees subject to fair-share agreements. This new constitutional calculus, they continue, “opens the door for Employees to directly assert and protect their nascent First Amendment claims” because “[t]here no longer are any sufficiently weighty state interests to justify compromising the First Amendment interests recognized in cases such as Abood.” Even if that were true, the Employees’ First Amendment interests have little to do with the claims raised by the Unions, which focus on the Unions’ free speech rights. The question of the Employees’ free speech rights is, as the district court explained, tangential.
2. Adequacy of Representation
Even assuming a direct interest in the litigation, the state adequately represents the interests of the Employees. The district court applied a deferential standard requiring gross negligence or bad faith to *659 render the state’s representation inadequate. However, that standard applies only “when the representative party is a governmental body charged by law with protecting the interests of the proposed intervenors [because] the representative is presumed to adequately represent their interests unless there is a showing of gross negligence or bad faith.” See Ligas, 478 F.3d at 774. The state is not charged by law with protecting the interests of the Employees so this standard does not apply. Nevertheless, the state still adequately represented the Employees’ interests.
Although intervention requires only a “minimal” showing of inadequate representation, see Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), when the prospective intervenor and the named party have the same goal, a “presumption [exists] that the representation in the suit is adequate,” Shea v. Angulo, 19 F.3d 343, 347 (7th Cir.1994). The prospective intervenor then must rebut that presumption and show that some conflict exists. Meridian Homes Corp. v. Nicholas W. Prassas & Co., 683 F.2d 201, 205 (7th Cir.1982). Here, the Employees and the state share the same goal: protecting Act 10 against the Unions’ constitutional challenge. The Employees have admitted as much, declaring that “[i]f Act 10 is declared valid, [the] Employees’ First Amendment rights are completely vindicated.” Thus, by their own admission, the Employees have exactly the same goal as the state. Yet they identify no conflict rendering the state’s representation inadequate. Instead, Employees rely largely on post-hoc quibbles with the state’s litigation strategy. This does not provide the conflict of interest necessary to render the state’s representation inadequate.[14]
In summation, the district court properly denied the Employees’ motion to intervene as of right. They did not articulate a direct, substantial, and legally cognizable interest in the litigation, nor was the state an inadequate representative of their interests. Thus, the district court below, and this Court on appeal, does not need to consider their arguments.
III. Conclusion
For the foregoing reasons, we Affirm the district court’s ruling that the collective bargaining provisions satisfy rational basis, Reverse the district court’s rulings that the recertification provisions and payroll deduction provisions do not satisfy rational basis, and Affirm the district court’s denial of proposed intervenors’ motion to intervene.

. The president of the Professional Firefighters of Wisconsin later ran against Governor Walker’s lieutenant governor in a recall election seeking to oust both Governor Walker and his lieutenant governor.

. The First Amendment would undoubtedly prohibit a state law that itself raised the cost of the Unions' speech by, for example, requiring payment of a fee to speak. See Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 136-37, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (invalidating law imposing content-based fee on speech). Act 10 imposes no costs of its own, though. It merely declines to pay a portion of the preexisting costs.

. Regulation of nonpublic forums requires some level of heightened scrutiny. See Perry Educ. Ass’n v. Perry Local Educ. Ass'n, 460 U.S. 37, 49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Restrictions on the use of nonpublic forums must be viewpoint neutral and reasonable in light of the purpose served by the forum. Id. Although the Court has never named this level of scrutiny, in requiring a connection between the restriction and the purpose of the forum, Perry appears to require more scrutiny than simple rational basis, which will sustain a viewpoint neutral law that serves any legitimate government objective.

. Velazquez involved a subsidy to legal aid organizations that discriminated on the basis of viewpoint, requiring as a condition of payment that the legal aid organization refrain from raising “arguments and theories Congress finds unacceptable[.]” 531 U.S. at 546, 121 S.Ct. 1043. Thus, although Velazquez referenced the Court’s nonpublic forum cases, it neither created nor applied an analogous form of heightened scrutiny in the subsidy context. Instead, by invalidating the viewpoint-based subsidy, Velazquez is entirely consistent with Regan's sole limitation on speech subsidies—viewpoint neutrality.

. The Unions also suggest Rosenberger requires finding abridgment of free speech when a speech subsidy makes speakerbased distinctions. But that case actually recognizes just the opposite: Rosenberger explained that Regan, in upholding a speech subsidy, "relied on a distinction based on preferential treatment of certain speakers—veterans' organizations—and not a distinction based on the content or messages of those groups' speech.” Rosenberger, 515 U.S. at 834, 115 S.Ct. 2510. Thus, Rosenberger actually reaffirms Regan 's determination that government may subsidize the speech of some speakers but not others.

. The Unions, of course, suggest that the relationship between the unions’ political views and status as a public safety union is no mere coincidence. But, as explained in the next section, we cannot conclude Act 10 is a neutral fagade for viewpoint discrimination.

. The dissent suggests that Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 811, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), compels a searching look beyond the text of the statute. (Dissenting op. at 662-63, 664.) We do not read Cornelius that broadly. Cornelius simply ‘'decline [d] to decide in the first instance whether the exclusion of respondents [from the Combined Federal Campaign] was impermissibly motivated by a desire to suppress a particular point of view.” Id. at 812-13, 105 S.Ct. 3439. “Respondents,” the Court noted, were "free to pursue this contention on remand.” Id. at 813, 105 S.Ct. 3439. We find nothing in this passage or any other language from Cornelius that encourages federal courts to search for some invidious motive when confronted with a facial challenge to a facially-neutral statute.

. We see viewpoint neutrality as a broadly applicable requirement to all laws implicating First Amendment concerns with a test that does not vary. Thus, unlike the dissent, we do not distinguish among cases analyzing viewpoint neutrality in the time, place, and manner context and the circumstances present here.
Moreover, time, place, and manner regulations of speech must satisfy additional requirements beyond those imposed on regulations of nonpublic forums. While regulation of nonpublic forums requires only viewpoint neutrality and "reasonable[ness] in light of the purpose served by the forum,” Cornelius, 473 U.S. at 806, 105 S.Ct. 3439 (citing Peny Educ. Ass'n, 460 U.S. at 49, 103 S.Ct. 948), the First Amendment requires much more of time, place, and manner restrictions. They must be content neutral (which includes both viewpoint and subject-matter neutrality, see Hill, 530 U.S. at 723, 120 S.Ct. 2480); serve a legitimate, substantial government interest; be narrowly tailored to serving that interest; and leave open ample alternative means of communication. Ward v. Rock Against Racism, 491 U.S. 781, 798-99, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Thus, it seems coun-terintuitive that viewpoint neutrality would receive closer judicial scrutiny in an area of speech like regulation of nonpublic forums than in an area subject to stiffer constitutional requirements, like time, place, and manner restrictions.

. The Court never reached, the question of whether the exemptions in City of Ladue rendered the statute underinclusive in a way that violated the First Amendment, though, because the Court concluded that the ban itself—regardless of any exemptions—violated the First Amendment. 512 U.S. at 58, 114 S.Ct. 2038.

. That is not to say that statements of legislative intent or legislative purpose are never relevant in determining whether the legislature acted with a viewpoint discriminatory motive when choosing to subsidize certain speakers but not others. For example, a statement of legislative purpose contained in a preamble or other uncodified provision, or contained in a conference or committee report could likely provide significant evidence of the legislature’s discriminatory motive. Here, we simply hold that one statement of a single legislator does not require invalidation of an otherwise viewpoint neutral and constitutional statute. When ruling a statute unconstitutional, "the stakes are sufficiently high ... to eschew [the] guesswork” inherent in judicial scrutiny of legislators’ statements. O’Brien, 391 U.S. at 384, 88 S.Ct. 1673.

. Moreover, at least with respect to the prison guards, there is an additional possible explanation for their exclusion from the public safety category. The trust fund statute, which Act 10 cross-references, also excludes them. Thus, it would be understandable if the Wisconsin legislature used that list as a starting point to choose those professions from which it feared a retaliatory strike. Even if we agree with the Unions that Act 10 should have placed prison guards in the public safety category, “a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked." McDonald v. Bd. of Election Comm’rs, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). In fact, the Court in Beach Communications similarly suggested the disputed FCC distinction survived rational basis because the Commission adopted it from an existing regulatory scheme. 508 U.S. at 317-18, 113 S.Ct. 2096.

. The district court engaged in two separate rational basis analyses, one under the Equal Protection Clause and another under the First Amendment. Rational basis review, however, is not a level of scrutiny under the First Amendment but merely the residual level of scrutiny that courts apply to all laws not involving a suspect class or infringing a fundamental right. See Ezell v. City of Chi., 651 F.3d 684, 701 (7th Cir.2011). Thus, only one rational basis analysis is necessary.

. The Employees also sought permissive intervention. The district court did not specifically address that argument, though, and the Employees have not raised permissive intervention on appeal.

. Nor does the Employees' long list of cases illustrating that such intervention happens "frequently” in this Circuit. None of these cases directly addresses the propriety of the intervention in those cases. Instead, each merely recognizes in passing that the intervention occurred at some prior point in the procedural history of the case.