In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3193

LABORERS LOCAL 236, AFL-CIO, *et al.*,

*Plaintiffs-Appellants,*

*v.*

SCOTT WALKER, Governor of Wisconsin, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 11-cv-462-wmc — **William M. Conley**, *Chief Judge*.

ARGUED FEBRUARY 24, 2014 — DECIDED APRIL 18, 2014

Before FLAUM and ROVNER, *Circuit Judges*, and KENDALL,
*District Judge*.*

FLAUM, *Circuit Judge*. This case raises more challenges to
the constitutionality of Wisconsin's Act 10, which we last
addressed in *Wisconsin Education Association Council v. Walker*, 705 F.3d 640 (7th Cir. 2013) ("*WEAC*"). Act 10 made sig-

---

* Of the Northern District of Illinois, sitting by designation.

nificant changes to Wisconsin public-sector labor law: it
prohibited government employers from collectively bargain-
ing with their general employees over anything except base
wages, made it more challenging for general-employee un-
ions to obtain certification as exclusive bargaining agents,
and precluded general-employee unions from using auto-
matic payroll deductions and fair-share agreements. The
plaintiffs, two public-employee unions and an individual
union member, argue that these changes infringe their First
Amendment petition and association rights. They also argue
that Act 10 denies union members the equal protection of the
laws.

The district court rejected the plaintiffs' constitutional
theories and granted judgment in Wisconsin's favor. We af-
firm.

## I. Background

Prior to 2011, Wisconsin granted broad protections and
privileges to public-sector unions. Under the State Employ-
ment Labor Relations Act and the Municipal Employment
Relations Act, state and municipal employers were obligated
to bargain in good faith with employee representatives over
a wide range of subjects, including wages and conditions of
employment. Unions could petition the Wisconsin Employ-
ment Relations Commission for an election to certify the un-
ion as the employees' exclusive bargaining agent; certifica-
tion required only a simple majority of those voting, and the
union remained certified until thirty percent of the employ-
ees in the bargaining unit petitioned for a decertification
election. Unions were also permitted to negotiate "fair-
share" agreements requiring nonunion employees to pay a
portion of the costs associated with the collective-bargaining

process. In addition, unions could utilize the state and municipal payroll systems to automatically collect membership dues.

Much of that changed when the Wisconsin legislature passed the "budget repair bill" known as Act 10. *See* Wis. Act 10, 2011–12 Leg., Jan. 2011 Spec. Sess. (Wis. 2011). The Act divided Wisconsin state and municipal employees into two categories: "public safety employees," which includes police officers, firefighters, deputy sheriffs, county traffic police officers, state troopers, and state motor vehicle inspectors; and "general employees," i.e., everyone else. *See* Act 10 §§ 214, 216, 268, 272.[1] Public safety employees, and their unions, continue to enjoy the protections and privileges of Wisconsin's preexisting scheme.

General employees, on the other hand, became subject to Act 10's various restrictions. To begin with, the Act reduced state and municipal employers' collective-bargaining obligations with respect to these employees. Public employers are still required to collectively bargain with their general employees over base-wage increases (though such increases cannot exceed a change in the Consumer Price Index). After Act 10, however, state and local employers are no longer required to bargain over anything else. *See* Act 10 §§ 210, 245, 262, 314. And in addition to limiting the scope of obligatory bargaining, Act 10 separately prohibited municipal employ-

---

[1] Shortly after Act 10's enactment, the Wisconsin legislature passed Act 32, which reinstated the collective-bargaining rights of certain municipal transit employees. *See* Wis. Act 32, 2011–12 Leg., 2011–12 Sess. (Wis. 2011). However, this modification does not affect the analysis in the present case.

ers from collectively bargaining with their general employees about non-wage issues. Act 10 § 169.

Further, Act 10 mandated that general-employee unions submit to a recertification election every year (instead of allowing unions to remain certified indefinitely). Certification now requires affirmative votes from an absolute majority of all employees in the bargaining unit, not just those voting. Act 10 §§ 242, 289. Act 10 also barred state and municipal employers from deducting union dues from their general employees' earnings. Act 10 §§ 227, 298. Finally, the Act prevented unions from imposing fair-share agreements on general employees. Act 10 §§ 213, 219, 267.

We have already rejected one challenge to Act 10's constitutionality. In *WEAC*, we held that Act 10's prohibition on payroll deductions did not violate the First Amendment. We found that the unions' previous use of the payroll system was the equivalent of the state subsidizing the unions' speech; accordingly, we reasoned that Wisconsin was free to withdraw this subsidy from certain groups so long as it did so on a viewpoint-neutral basis. *WEAC*, 705 F.3d at 645. And we concluded that Act 10's distinction between public safety and general employees was, in fact, viewpoint-neutral. *Id.* at 648.

The *WEAC* plaintiffs also raised an equal-protection challenge to Act 10's limitations on statutory collective bargaining, its stricter recertification requirements, and the payroll-deduction prohibition. They argued that Act 10's distinction between public safety and general employees—along with how the law classified particular employees—denied the general employees equal protection. *Id.* at 653. However, because Act 10 did not employ a suspect classification, and be-

cause we found that none of the three challenged provisions implicated a fundamental right, we applied rational-basis review. *Id.* The law's distinction between public safety and general employees held up under this standard. *Id.* at 654–57.

At this litigation's outset, the plaintiffs—two general-employee unions that represent city of Madison and Dane County employees, and an individual union member—raised arguments similar to those asserted in *WEAC*. (For ease of reference, we'll call all three plaintiffs "the unions.") But the unions also pled other First Amendment and Equal Protection Clause theories unique to this case. Finding that these arguments failed to state a constitutional violation, the district court granted Wisconsin's motion for a judgment on the pleadings. *See Laborers Local 236 v. Walker*, No. 11-cv-462-wmc, 2013 WL 4875995 (W.D. Wis. Sept. 11, 2013). The unions appeal.

## II. Discussion

In evaluating the state's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), a court must determine whether "the complaint sets forth facts sufficient to support a cognizable legal theory." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013). On appeal, we answer this question de novo. *Id.*

We begin, however, with statutory interpretation. The two sides have a fundamental disagreement about Act 10's effect upon municipal employees' collective-bargaining rights. Because our Article III jurisdiction over most of the unions' claims depends on the outcome of this dispute, we must settle it before proceeding to the merits.

### A.  The meaning of Wis. Stat. § 66.0508(1m)

As discussed above, Act 10 altered Wisconsin's public-sector collective-bargaining law in more than one way. First, the Act amended the State Employment Labor Relations Act, Wis. Stat. § 111.81 *et seq.* ("SELRA"), and the Municipal Employment Relations Act, Wis. Stat. § 111.70 *et seq.* ("MERA"), to only require state and municipal employers to collectively bargain with their general employees over base-wage increases. *See* Act 10 §§ 210, 262. In addition, however, § 169 of the Act created a new code section, Wis. Stat. § 66.0508, titled "Collective bargaining." This new section reads in relevant part:

> (1) In this section, "local governmental unit" has the meaning given in s. 66.0506(1).[2]
>
> (1m) Except as provided under subch. IV of ch. 111 [the amended, post–Act 10 MERA], no local governmental unit may collectively bargain with its employees.
>
> (2) If a local governmental unit has in effect on June 29, 2011, an ordinance or resolution that is inconsistent with sub. (1m), the ordinance or resolution does not apply and may not be enforced.

---

[2] Wis. Stat. § 66.0506(1) defines "local governmental unit" as "any city, village, town, county, metropolitan sewerage district, long-term care district, transit authority … local cultural arts district … or any other political subdivision of the state, or instrumentality of one or more political subdivisions of the state." This definition tracks MERA's definition of "municipal employer," *see* Wis. Stat. § 111.70(1)(j), and we follow the parties' lead in using the terms interchangeably.

…

Wis. Stat. § 66.0508.

The unions point to (1m) as the source of their constitutional troubles. They argue that this language prohibits municipal employers from collectively bargaining with their general employees about anything other than base wages— even if the employers want to bargain outside of MERA's statutory framework. For example, the city of Madison, acting as an amicus curiae, tells us that it voluntarily engaged in collective bargaining with its employees in the 1950s, before Wisconsin established statutory collective bargaining in 1959. Amicus Br. 1. Madison and the unions read § 66.0508(1m) to now bar the city from negotiating these kinds of agreements with its general employees. *See id.* ("Act 10 actually strips municipalities of the primary tool used for decades to craft tight budgets and maintain positive relations with their employees.").

Wisconsin, to the contrary, urges us to read § 66.0508(1m) more narrowly. The state claims that the provision incorporates the definition of "collective bargaining" set forth in MERA: "the performance of the mutual obligation of a municipal employer … and the representative of its municipal employees in a collective bargaining unit, to meet and confer at reasonable times, in good faith, with the intention of reaching an agreement … with respect to wages for general employees." Wis. Stat. § 111.70(1)(a). Thus, Wisconsin argues:

> in the context of Wis. Stat. § 66.0508(1m), "collective bargaining" means only the *statutorily-created* "mutual obligation" of a municipal em-

> ployer and a bargaining unit representative to negotiate a labor agreement. … In other words, "collective bargaining" in Wis. Stat. § 66.0508(1m) is an act of legislative grace … . As a result, Wis. Stat. § 66.0508(1m) merely prohibits statutory collective bargaining for general municipal employees outside of MERA.

Appellees' Br. 14–15.

Wisconsin's interpretation comes as a surprise to the unions—and to us—for it would mean that Madison and other local governments are still free to sit down at the table with their general employees and bargain collectively over anything they like. But if that is so, then the constitutional "right" the unions think Act 10 infringes is actually untouched by the Act. Most of the unions' constitutional claims derive from the fact that, in their view, Act 10 precludes their employers from even voluntarily bargaining with them. So if Wisconsin's interpretation is correct, then the unions have nothing to complain about—and there would be no "case or controversy" for us to resolve. *See Wis. Envtl. Decade, Inc. v. State Bar of Wis.*, 747 F.2d 407, 410 (7th Cir. 1984) ("Federal courts established pursuant to Article III of the Constitution do not render advisory opinions.").

However, we find the unions' interpretation of § 66.0508(1m) more plausible. Wisconsin contends that the provision "merely prohibits statutory collective bargaining for general municipal employees outside of MERA." Yet Wisconsin uses the term "statutory collective bargaining" to refer to the collective-bargaining obligations imposed on municipal employers *under MERA*. Taken literally, Wiscon-

sin is saying that Act 10 prohibits municipal employers from collectively bargaining *under* MERA *outside of* MERA. We cannot figure out what this command would mean.

Perhaps what Wisconsin means to say is that § 66.0508(1m)'s only effect is to obligate municipalities to collectively bargain with their general employees to the extent set forth in MERA. If that is the case, though, then § 66.0508(1m) is entirely redundant. Other provisions of MERA—as amended—already make explicit the newly limited scope of the municipalities' statutory obligation. *See* Wis. Stat. § 111.70(1)(a) (giving the definition of "collective bargaining" quoted above); *id.* § 111.70(4)(mb) (listing "[a]ny factor or condition of employment except wages" as a "prohibited subject[] of bargaining" under MERA with respect to general employees). And Wisconsin law follows the general rule of statutory interpretation that "[s]tatutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 681 N.W.2d 110, 124 (Wis. 2004).

In the absence of an authoritative interpretation from the Wisconsin Supreme Court,[3] we must interpret § 66.0508(1m) as we think the state's highest court would construe it. *Brownsburg Area Patrons Affecting Change v. Baldwin*, 137 F.3d

---

[3] Act 10's collective-bargaining limitations have been challenged in the Wisconsin state courts. So far, none of the decisions have addressed § 66.0508(1m) specifically. *See Madison Teachers, Inc. v. Walker*, No. 11CV3774, 2012 WL 4041495 (Wis. Cir. Ct. Sept. 14, 2012), *certified to the Wis. Sup. Ct. by* No. 2012AP2067, 2013 WL 1760805 (Wis. Ct. App. Apr. 25, 2013), *petition to certify granted by* 839 N.W.2d 619 (Table) (Wis. 2013); *Wis. Law Enforcement Ass'n v. Walker*, No. 12CV4474 (Wis. Cir. Ct. Oct. 23, 2013).

503, 507 (7th Cir. 1998). Wisconsin law requires courts to "focus primarily on the language of the statute," as Wisconsin courts "assume that the legislature's intent is expressed in the statutory language." *State ex rel. Kalal*, 681 N.W.2d at 124. Therefore, giving effect to § 66.0508(1m)'s plain language, we interpret the provision to prohibit municipal employers from reaching binding agreements with their general employees on a collective basis, if the agreement concerns anything other than the employees' base wages.

### B.  The First Amendment

Having concluded that Act 10 is as sweeping as the unions believe, we can now address the merits of their constitutional claims. The unions articulate several theories attacking Act 10 under the First Amendment. However, they are imprecise in their framing. As best we can tell, they are making two distinct claims: first, that the collective-bargaining prohibition just discussed—§ 68.0508(1m)—violates their members' rights to petition the government for redress of grievances, and second, that Act 10's various restrictions, in their cumulative effect, violate their associational rights. Although the district court analyzed the theories together as a single claim of a violation of the right "to associate, assemble and express their views in concert," *Laborers Local 236*, 2013 WL 4875995, at *2, we find it helpful to address the petition and association arguments separately.

### 1.  The Petition Clause

We begin our First Amendment analysis by emphasizing that § 66.0508(1m) does not proscribe any conduct by the unions themselves. It does not prohibit the unions from form-

ing. It does not forbid them from meeting. Nor does it prevent the unions from advocating on behalf of their members in any way they see fit.

Instead, the collective-bargaining restriction acts upon *government employers*. The statute tells these employers that they may not enter into binding agreements with their employees on a collective basis about anything other than base wages. Thus, as the district court recognized, "[u]nder Act 10, general employees remain free to associate and represented employees and their unions remain free to speak; municipal employers are simply not allowed to listen." *Laborers Local 236*, 2013 WL 4875995, at *5. We agree with the district court that under Supreme Court precedent, such a law is constitutional.

There are two cases on point. The first is *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463 (1979) (per curiam). In *Smith*, the Arkansas State Highway Commission refused to recognize employee grievances filed by a union on behalf of its members. Instead, the Commission only considered grievances filed by the employees themselves. *Id.* at 463. The union argued that the Commission's practice of "bypassing the union" violated the First Amendment because it denied the unions the ability to effectively represent their members. *Id.* at 463–64.

The Supreme Court disagreed. It reasoned that the Constitution's protection of speech and petition "provides no guarantee that a speech will persuade or that advocacy will be effective." *Id.* at 464–65. Accordingly, the Court held, "the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it." *Id.* at

465. *Smith*'s analysis accorded with precedent from our circuit holding that state entities have no constitutional duty to engage in collective bargaining. *See Hanover Twp. Fed'n of Teachers Local 1954 v. Hanover Cmty. Sch. Corp.,* 457 F.2d 456, 461 (7th Cir. 1972); *Indianapolis Educ. Ass'n v. Lewallen,* 1969 WL 11147, at *2 (7th Cir. 1969).

The unions acknowledge that *Smith* prevents them from claiming an entitlement to a mandated collective-bargaining procedure—or to any response from the state at all. But the unions argue that Act 10 goes one step further than the withdrawal of previously existing labor protections: as discussed above, § 66.0508(1m) *precludes* state employers from engaging in collective binding negotiations over anything but wages. The unions maintain that Wisconsin cannot constitutionally deny municipal employers their ability "to choose whether to listen." In short, the unions claim a First Amendment right to ask their public employers to bargain, knowing that the employers could (but need not) accept their invitation.

This argument is foreclosed by the second Supreme Court case on point, *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984). *Knight* concerned a Minnesota statutory scheme that divided public employees into bargaining units and allowed each unit to designate an exclusive representative. *Id.* at 273–74. The state employer was required to "meet and negotiate" with that representative on a host of specific matters that the law considered terms and conditions of employment (a process the Court described as "mandatory bargaining"). *Id.* at 274. But the Minnesota law also granted professional employees the right to "meet and confer" with their employers about other employment-

related matters (called "nonmandatory subjects"). *Id.* The meet-and-confer process, unlike the meet-and-negotiate process, did not require the employer to negotiate in good faith to reach an agreement. *Id.* However, if a particular bargaining unit had designated an exclusive representative for the meet-and-negotiate process, the law, in turn, prohibited the employer from participating in either process with anyone other than that representative. *Id.* at 274–75. This meant that "[i]f professional employees forming an appropriate bargaining unit [had] selected an exclusive representative for mandatory bargaining, their employer [could] exchange views on nonmandatory subjects only with the exclusive representative." *Id.* at 273.

In *Knight*, faculty instructors who did not wish to join the union serving as their bargaining representative argued that Minnesota's "restriction on participation in the nonmandatory-subject exchange process" violated their First Amendment rights. *Id.* The Supreme Court rejected the instructors' claim. The Court explained, as it had in *Smith*, that "[n]othing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Id.* at 285. And nothing about the plaintiffs' status as public employees, the Court continued, gave them a greater entitlement to a receptive audience—or any audience at all—with the state. *Id.* at 286–87. Accordingly, the Court reaffirmed the principle from *Smith*, and held that the instructors "have no constitutional right to force the government to listen to their views." *Id.* at 283, 286–87.

The fact that the Supreme Court applied *Smith*'s holding to the distinct facts in *Knight* directs our outcome here. The unions' complaint is that Act 10 bars Wisconsin public employers from voluntarily entering into binding negotiations with a group of employees. But that was the case in *Knight* as well. Under the Minnesota statutory scheme, when it came to the formal meet-and-negotiate and meet-and-confer processes, state community colleges were prohibited from listening to the faculty instructors individually. *Id.* at 274–75. Yet the Court was untroubled, reasoning that "Minnesota has simply restricted the class of persons to whom it will listen in its making of policy." *Id.* at 282.

True, the *Knight* opinion emphasized that while individual instructors could not utilize the meet-and-negotiate and meet-and-confer processes, nothing prevented the employer from listening to the excluded instructors in a less formal setting. *See id.* at 276–77 & n.4 ("[T]he prohibition on the employer's holding 'meet and confer' sessions with anyone but the exclusive representative has been understood to bar only a certain type of formal exchange, not other exchanges of views."). The present situation is no different in this regard. Nothing in Wis. Stat. § 66.0508(1m), or Act 10 generally, precludes the unions or their members from expressing their views to their municipal employer or from trying to persuade the employer to adopt a particular policy. In fact, since Act 10's enactment, some local employers and unions have collaborated informally in order to make changes in the workplace. *See* Milwaukee, Wis., Code of Ordinances § 340-3(2)(a) (requiring Milwaukee's department of employee relations to "[m]eet and confer with employees and employee groups, including currently and previously-certified employee groups, for the purpose of communicating, soliciting

and exchanging information, views, ideas and interests concerning wages, hours, and other conditions of employment"); Steven Greenhouse, *Wisconsin's Legacy for Unions*, N.Y. Times, Feb. 22, 2014, at BU1 (describing how a teachers' union in Racine held "nearly 30 meetings—technically not bargaining sessions—with district officials," who ultimately agreed to incorporate terms that had previously been in the teachers' contracts into a district handbook on school policies).

The unions, ignoring *Knight*, assert that "[t]he ability of municipal employees to engage in the activity of bargaining collectively with their employers, in the hope of reaching a voluntary agreement regarding their wages and other conditions of employment, is a fundamental right." Reply Br. 2. The unions further aver that both the Supreme Court and our court have long recognized that the Constitution protects this right, citing language from *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33–34 (1937), *Amalgamated Utility Workers v. Consolidated Edison Co. of New York*, 309 U.S. 261, 263–64 (1940), *Thomas v. Collins*, 323 U.S. 516, 534 (1945), and *McLaughlin v. Tilendis*, 398 F.2d 288, 288–89 (7th Cir. 1968). There are three problems with this assertion. First, two of the cases the unions cite—*Jones & Laughlin* and *Amalgamated Utility Workers*—involved private employers. So the "right" the Court was referring to in those cases could not have been constitutional. *E.g.*, *The Civil Rights Cases*, 109 U.S. 3, 17–18 (1883). Second, the relevant discussion in each case stands only for the proposition—unquestioned by Wisconsin and the district court—that individuals have a right (constitutional or otherwise) to associate together in a union, to discuss matters pertaining to union membership, to select their own representatives, and to attempt to use their collective

weight to advocate for change. None of those cases establish what the unions assert here: that they have a constitutional entitlement to an opportunity to collectively bargain with the state. And we find the unions' contention that this is a long-standing fundamental right difficult to square with the fact that several states have prohibited public-sector collective bargaining over at least some topics.[4]

We are also skeptical that this right could be recognized going forward. Again, the unions say that they are entitled to an opportunity to engage in voluntary collective bargaining with their state employers in the hope of reaching an agreement. How would that right operate in practice? The unions contend that a state may not statutorily bar local government employers from collectively negotiating with their employees. But what if the employer itself—say, a school district—adopted a written policy that it would no longer collectively bargain?[5] What if the district administra-

---

[4] *See, e.g.*, N.C. Gen. Stat. § 95-98 (declaring any agreement or contract between a state or local government unit and an employee bargaining agent to be illegal) (enacted 1959); Va. Code § 40.1-57.2 (prohibiting any state or local government unit from collective bargaining with its employees on any subject) (enacted 1993); Ind. Code 20-29-6-4.5 (prohibiting school employers from collectively bargaining over anything other than salary, wages, and salary- and wage-related fringe benefits) (enacted 2011). *See generally* Martin H. Malin, *Does Public Employee Collective Bargaining Distort Democracy? A Perspective from the United States*, 34 Comp. Lab. L. & Pol'y J. 277 (2013) (describing these and other state laws and court decisions prohibiting or limiting public-sector collective bargaining).

[5] We note that this was the case (analogously) in *Smith*: the Arkansas State Highway Commission "adopted" the grievance procedure at issue, under which "the Highway Commission [would] not consider an employee's grievance" unless the employee submitted it directly to the Ar-

tor consistently declined to sit down at the negotiating table? Or simply refused to take the union's calls? Surely the line between constitutionality and unconstitutionality is not drawn according to how open a state decisionmaker is to what you have to say. Without a principle to delineate the amount of solicitude the Constitution requires of state officials, the federal courts should steer clear. "Public officials at all levels of government daily make policy decisions based only on the advice they decide they need and choose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing governmental practices." *Knight*, 465 U.S. at 284.

We therefore conclude that Act 10's prohibition on collective bargaining does not run afoul of the Petition Clause.

## 2. Right of association

We next address whether Act 10's provisions, in their cumulative effect, violate the unions' associational rights. The freedom of association is implicit in the First Amendment's protections. *E.g.*, *NAACP v. Button*, 371 U.S. 415, 430 (1963); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006) ("*FAIR*") ("The reason we have extended First Amendment protection in this way is clear: The right to speak is often exercised most effectively by combining one's voice with the voices of others."). The government might burden this right in a number of ways: for instance, by punishing group membership, *see Elfbrandt v. Russell*, 384 U.S. 11, 16–18 (1966), interfering in the group's internal affairs, *see Roberts v. United States Jaycees*, 468 U.S.

---

kansas State Highway Department. *Ark. State Highway Emps. Local 1315 v. Smith*, 459 F. Supp. 452, 453–55 (E.D. Ark. 1978), *rev'd*, 441 U.S. 463 (1979).

609, 622–23 (1984), or distorting the group's message, *see Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

The unions cannot claim that Act 10 does any of those things. As we said before, nothing in Act 10 prohibits unions from forming, meeting, or organizing. To the contrary, Wisconsin affirmatively protects these activities. *See* Wis. Stat. § 111.70(2) ("Municipal employees have the right of self-organization, and the right to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in lawful, concerted activities for the purpose of collective bargaining or other mutual aid or protection."). None of Act 10's provisions disadvantage employees who choose to join a union. Act 10 does not tell unions how to conduct their internal affairs. And as we emphasized in *WEAC*, "Act 10 places no limitations on the speech of general employee unions, which may continue speaking on any topic or subject." 705 F.3d at 646.

Instead, the unions complain that Act 10's various restrictions and obstacles make it more difficult for them to accomplish what they were formed to do: represent their members' interests through the collective-bargaining process. The unions argue that public employees will find the prospect of joining far less appealing now that general-employee unions can only negotiate agreements about their base wages (and even then, only to the extent of a cost-of-living increase). In the unions' view, this diminished support—exacerbated by Act 10's stringent recertification requirements, its prohibition on automatic payroll deductions, and its prohibition on fair-share agreements—will necessarily "undermine the ability of the labor organization to continue to function." Appellants' Br. 21.

But the First Amendment does not require the state to maintain policies that allow certain associations to thrive. For the most part, "[t]he Bill of Rights enshrines negative liberties. It directs what government may not do to its citizens, rather than what it must do for them." *WEAC*, 705 F.3d at 645. Again, Act 10 only acts upon the state. The law's changes prevent public employers from acting in certain ways, or adopting certain procedures, that were once beneficial to Wisconsin public-sector unions and their members. We take the plaintiffs' point that Act 10 will likely have the effect of making things more challenging for general-employee unions. *Cf. Smith*, 441 U.S. at 465–66 (assuming that the Highway Commission's policy of refusing to recognize union-submitted grievances "tends to impair or undermine—if only slightly—the effectiveness of the union in representing the economic interests of its members" (footnote omitted)). "But this type of 'impairment' is not one that the Constitution prohibits." *Id.* at 466.[6]

The unions protest that they are an expressive association whose core purpose is to bargain with state employers on their employees' behalf. By enacting laws that prevent the unions from accomplishing this purpose, the unions argue,

---

[6] The Supreme Court has "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity" on the grounds that these laws "made group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to express its message." *FAIR*, 547 U.S. at 69 (citing *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 101–02 (1982)). But there is a significant difference between a law that "makes group membership less attractive" because it opens the group's members up to harassment and retaliation and a law that makes membership less appealing solely by decreasing its utility.

Wisconsin has weakened their association to a devastating extent. But that simply is not how the First Amendment works. An organization cannot come up with an associational purpose—even a purpose that involves speech—and then require support from the state in order to realize its goal.

In *Smith*, the Supreme Court observed that "[f]ar from taking steps to prohibit or discourage union membership or association, all that [the state] has done in its challenged conduct is simply to ignore the union. That it is free to do." 441 U.S. at 466. The same holds true here. The unions cannot wield the First Amendment to force Wisconsin to engage in a dialogue or continue the state's previous policies. For this reason, none of Act 10's proscriptions—individually or cumulatively—infringe the unions' associational rights.

## C. The Equal Protection Clause

Finally, the unions invoke the Equal Protection Clause. Their claim tries a different angle from the one we rejected in *WEAC*. There, the issue was Act 10's distinction between public safety and general employees. Here, the unions argue that Act 10's collective-bargaining rules impermissibly disadvantage "represented employees," i.e., employees who choose to express their grievances by joining a union, as opposed to "individual employees," those who prefer to go it alone.[7]

---

[7] On appeal, the unions also argue that Act 10 treats labor organizations differently than other organizations. Specifically, they point out that the Act's prohibition on collective bargaining applies only to organizations made up of employees. *See* Wis. Stat. § 66.0508(1m). They suggest that, in theory, municipal employers are still free to bargain with other kinds of

Government line-drawing that does not infringe a fundamental right and is not based on a suspect classification is subject only to rational-basis review. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). However, the unions contend that Act 10's line-drawing infringes fundamental First Amendment rights. They argue that under Act 10, local governments cannot make binding agreements with a general employee's bargaining representative regarding most employment terms and conditions—but that local governments are not similarly limited when it comes to their making such agreements with individual employees. This differential treatment of represented employees and individual employees, they argue, amounts to the state punishing the former for exercising their petition and association rights. Accordingly, the unions maintain, strict scrutiny applies, and Wisconsin must put forth a compelling interest for its law and show that it is narrowly tailored to that interest.

We must again reject the union's characterization of the law. Wisconsin is not treating employees differently based on the employees' exercise of their associational rights. At the risk of repeating ourselves, we stress that Act 10 does not mandate any form of unfavorable treatment for union members. These employees still possess every right, and are given every opportunity, that the state grants to their colleagues who elect not to join a union. It's just that Wisconsin has re-

---

groups. We have difficulty coming up with another type of organization that would wish to make a binding agreement with a municipal employer about its employees' terms and conditions. But in any event, the unions did not raise this particular equal-protection theory before the district court. It is therefore waived. *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010).

fused to participate in an activity that the represented employees want the state to engage in. Wisconsin has chosen to recognize individual employees as appropriate bargaining partners for municipal employers, but not union representatives. That is Wisconsin's choice to make. The association right does not compel public employers to sit down at the table with whomever an employee may wish to represent them.

Having concluded that none of Act 10's provisions implicate the First Amendment, we need only examine Wisconsin's distinction between represented and nonrepresented employees for a rational basis. *See WEAC*, 705 F.3d at 653. The district court upheld the distinction under this highly deferential standard. *Laborers Local 236*, 2013 WL 4875995, at *5–6; *see also WEAC*, 705 F.3d at 653 ("[Act 10] is presumed constitutional, and we impose a weighty burden on the Unions—they must 'negative every … basis which might support' the law because we will uphold it 'if there is any reasonably conceivable state of facts' supporting the classification." (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993))). The unions have conceded that Act 10's collective-bargaining restriction passes muster if we apply rational-basis review. Reply Br. 11–12. This was a prudent concession, as we have previously found Wisconsin's limitations on the scope of statutory collective bargaining rationally related to a legitimate government interest: "promot[ing] flexibility in state and local government budgets by providing public employers more leverage in negotiations." *WEAC*, 705 F.3d at 654. So our equal-protection analysis can end here.

### III. Conclusion

Act 10 does not violate the First or Fourteenth Amendments to the United States Constitution. We therefore AFFIRM the district court's judgment in favor of the state.