In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

Nos. 14-1822, 14-1888, 14-1899, 14-2006, 14-2012, 14-2023 & 14-2585

ERIC O'KEEFE and WISCONSIN CLUB FOR GROWTH, INC.,

*Plaintiffs-Appellees,*

*v.*

JOHN T. CHISHOLM, *et al.*,

*Defendants-Appellants.*

FRANCIS SCHMITZ,

*Defendant-Appellant / Cross-Appellee.*

REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, *et al.*,

*Intervenors-Appellants.*

UNNAMED INTERVENORS NO. 1 AND NO. 2,

*Intervenors-Appellees.*

———————————

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 14-C-139 — **Rudolph T. Randa**, *Judge.*

———————————

ARGUED SEPTEMBER 9, 2014 — DECIDED SEPTEMBER 24, 2014

———————————

Before Wood, *Chief Judge*, and Bauer and Easterbrook, *Circuit Judges*.

Easterbrook, *Circuit Judge*. A federal district judge issued an injunction that blocks the State of Wisconsin from conducting a judicially supervised criminal investigation into the question whether certain persons have violated the state's campaign-finance laws. The court did this despite 28 U.S.C. §2283, the Anti-Injunction Act, which provides: "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." *Mitchum v. Foster*, 407 U.S. 225 (1972), holds that 42 U.S.C. §1983 authorizes anti-suit injunctions but adds that principles of "equity, comity, and federalism" (407 U.S. at 243) determine whether they are appropriate. Cf. *Younger v. Harris*, 401 U.S. 37 (1971). We hold that this case does not present a situation in which state proceedings may be displaced.

The ongoing criminal investigation is being supervised by a judge, in lieu of a grand jury. Wis. Stat. §968.26. Prosecutors in Wisconsin can ask the state's courts to conduct these inquiries, which go by the name "John Doe proceedings" because they may begin without any particular target. The District Attorney for Milwaukee County made such a request after concluding that the campaign committee for a political official may have been coordinating fund-raising and expenditures with an "independent" group that was raising and spending money to speak about particular issues. (We put "independent" in quotation marks, which we drop from now on, because the prosecutor suspected that the group's independence is ostensible rather than real.

Whether, and if so how, this group and the campaign committee have coordinated their activities is a subject we need not consider.) Wisconsin's Government Accountability Board, which supervises campaigns and conducts elections, likewise called for an investigation. District Attorneys in four other counties made similar requests. Eventually a single John Doe proceeding was established, with Gregory Peterson as the judge and Francis Schmitz as the special prosecutor. Judge Peterson has been recalled to service following his retirement from a post on the state's court of appeals; Schmitz, an attorney in private practice, used to be an Assistant United States Attorney in Milwaukee.

At the behest of special prosecutor Schmitz, the court issued subpoenas requiring their recipients to produce documents. One came to Eric O'Keefe, who manages Wisconsin Club for Growth, Inc., an advocacy group that raises money and engages in speech on issues such as whether Wisconsin should limit collective bargaining in public employment, a subject that has received considerable legislative attention and sparked a recall election for the Governor. (Both the Supreme Court of Wisconsin and this court have held that the legislation promoted by the Club for Growth is valid. *Madison Teachers, Inc. v. Walker*, 2014 WI 99 (July 31, 2014); *Laborers Local 236 v. Walker*, 749 F.3d 628 (7th Cir. 2014).) The subpoena issued to O'Keefe is extraordinarily broad, covering essentially all of the group's records for several years—including records of contributors that O'Keefe believes are covered by a constitutional right of anonymity.

O'Keefe moved to quash the subpoena, which he maintains is designed to punish his, and the Club's, support for controversial legislation, rather than to investigate a viola-

tion of state law. He contended that revealing to the state lists of contributors would harm the organization's ability to raise funds—and this even though all information is covered by a broad secrecy order. Judge Peterson quashed the subpoena, ruling that the evidence is not necessary to the investigation. One of his reasons is that Schmitz has not established any solid reason to believe that a violation of state law has occurred.

That was in January 2014. Schmitz asked the Wisconsin Court of Appeals for a supervisory writ. Two other people involved in the investigation asked the Supreme Court of Wisconsin to grant review, bypassing the Court of Appeals. Before either the Court of Appeals or the Supreme Court could act, however, O'Keefe and the Club filed this federal suit, asking for an injunction that would halt the investigation permanently, whether or not the prosecutor could establish a violation of Wisconsin law. O'Keefe also requested damages against five defendants: Schmitz plus the District Attorney for Milwaukee County, two of his assistants, and an investigator. (Judge Peterson is the sixth defendant.)

The district court held that the First Amendment to the Constitution (applied to the states through the Fourteenth) forbids not only penalties for coordination between political committees and groups that engage in issue advocacy, but also any attempt by the state to learn just what kind of coordination has occurred. 2014 U.S. Dist. LEXIS 63066 (E.D. Wis. May 6, 2014). It issued this injunction:

> The Defendants must cease all activities related to the investigation, return all property seized in the investigation from any individual or organization, and permanently destroy all copies of information and other materials obtained through the investigation. Plaintiffs and others are hereby relieved of any and every

> duty under Wisconsin law to cooperate further with Defendants' investigation. Any attempt to obtain compliance by any Defendant or John Doe Judge Gregory Peterson is grounds for a contempt finding by this Court.

*Id*. at *36–37. The court scheduled proceedings on plaintiffs' request for damages and rejected defendants' argument that they enjoy qualified, if not absolute, immunity. We immediately stayed the portion of the injunction requiring documents to be returned or destroyed and set the case for expedited briefing and argument.

The issuance of injunctive relief directly against Judge Peterson is hard to justify in light of the Anti-Injunction Act, and the district court did not try to do so. The Anti-Injunction Act embodies a fundamental principle of federalism: state courts are free to conduct their own litigation, without ongoing supervision by federal judges, let alone threats by federal judges to hold state judges in contempt. The scope given to state litigation is especially great in the realm of criminal investigations and prosecutions, a principle that led to *Younger*, which requires a federal court to abstain even if an injunction would be justified under normal principles, except in rare situations. See *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584 (2013), which discusses the current state of *Younger*'s abstention doctrine.

Courts of appeals have disagreed about the extent to which *Younger* compels abstention when states are conducting grand-jury investigations (which John Doe proceedings are like). Compare *Craig v. Barney*, 678 F.2d 1200, 1202 (4th Cir. 1982), and *Texas Association of Business v. Earle*, 388 F.3d 515, 519–20 (5th Cir. 2004), with *Monaghan v. Deakins*, 798 F.2d 632, 637–38 (3d Cir. 1986), vacated in part on other grounds, 484 U.S. 193 (1988), and with *Kaylor v. Fields*, 661

F.2d 1177, 1182 (8th Cir. 1981). We need not take sides, because principles of equity, comity, and federalism (*Mitchum*, 407 U.S. at 243) counsel against a federal role here. See also *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) (standards for preliminary injunction).

One important question is whether the plaintiff suffers irreparable injury. O'Keefe and the Club say yes, because donations have dried up, but that's not the right temporal perspective. We must ask whether the injury would be irreparable if the federal court were to stay its hand. And it is hard to see that kind of injury, because plaintiffs obtained effective relief from Judge Peterson *before* the federal judge acted—indeed, before filing this suit. True, uncertainty will continue pending appellate review within the Wisconsin judiciary, and this may well affect donations, but the commencement of this federal suit also produces uncertainty, because it entails review by a district judge, three or more appellate judges, and potentially the Supreme Court of the United States. The state case might be over today had the district judge allowed it to take its course.

A second important question is whether the plaintiff has adequate remedies at law (which is to say, without the need for an injunction). That Judge Peterson entertained and granted the motion to quash shows that the answer is yes.

A third important question is whether federal relief is appropriate in light of normal jurisprudential principles, such as the rule against unnecessary constitutional adjudication. Courts must strive to resolve cases on statutory rather than constitutional grounds. See, e.g., *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582 (1979). Yet the district court waded into a vexed field of constitutional law need-

lessly. Judge Peterson had already concluded that the investigation should end as a matter of state law, because prosecutor Schmitz lacks evidence that state law has been violated. The result is an injunction unnecessary at best, advisory at worst.

Declaring "X violates the Constitution" is advisory if the state does not use rule X to begin with. The Supreme Court of Wisconsin may disagree with Judge Peterson, and prosecutor Schmitz argues that state law is on his side, see *Wisconsin Coalition for Voter Participation, Inc. v. Wisconsin Elections Board*, 231 Wis. 2d 670 (Wis. App. 1999), so we cannot yet know whether the federal injunction is advisory, but we are confident that it is imprudent. Sometimes district judges must abstain to allow state courts to resolve issues of state law, see *Texas Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), but as with *Younger* we are not invoking a mandatory-abstention command but instead are asking whether normal principles of equity support the district court's approach.

*Younger* and its successors, including *Sprint Communications*, do show, however, that the policy against federal interference in state litigation is especially strong when the state proceedings are criminal in nature. That's a fourth important subject militating against a federal injunction.

*Mitchum* held that a judge may use §1983 to support an anti-suit injunction, notwithstanding §2283, only when justified in light of "the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." 407 U.S. at 243. Yet the district court gave those principles no weight. The court did say that an injunction is appropriate because the defendants have acted

"in bad faith" but did not hold a hearing, so that the court must have meant bad faith objectively rather than subjectively—in other words, the federal judge must have thought that no reasonable person could have believed that the John Doe proceeding could lead to a valid conviction. See *Mitchum*, 407 U.S. at 230–31, relying on *Younger*, 401 U.S. at 53, and *Perez v. Ledesma*, 401 U.S. 82, 85 (1971).

One version of objective bad faith was the one on which we relied in *Mulholland v. Marion County Election Board*, 746 F.3d 811 (7th Cir. 2014), when holding that a district judge properly issued an injunction to prevent state law-enforcement personnel from prosecuting a supposed violation of Indiana's election laws. No reasonable person could have thought that the proceeding would lead to a valid conviction, because the defendants were prohibited by a federal injunction, issued a decade earlier, from penalizing those very tactics. That injunction had been issued when no state prosecution was pending; that's the right time for federal courts to determine the validity of state campaign regulations. See, e.g., *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014); *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014); *Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012). We held that defendants could not shelter behind *Younger* to avoid an outstanding federal resolution. Nothing of the kind happened in this investigation; until the district court's opinion in this case, neither a state nor a federal court had held that Wisconsin's (or any other state's) regulation of coordinated fund-raising and issue advocacy violates the First Amendment.

Starting with *Buckley v. Valeo*, 424 U.S. 1, 46–47, 78 (1976), the Supreme Court has stated repeatedly that, although the

First Amendment protects truly independent expenditures for political speech, the government is entitled to regulate coordination between candidates' campaigns and purportedly independent groups. See also, e.g., *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 447 (2001); *McConnell v. FEC*, 540 U.S. 93, 202–03, 219–23 (2003), overruled in part on other grounds by *Citizens United v. FEC*, 558 U.S. 310 (2010). This is so because *Buckley* held that the Constitution allows limits on how much one person can contribute to a politician's campaign. If campaigns tell potential contributors to divert money to nominally independent groups that have agreed to do the campaigns' bidding, these contribution limits become porous, and the requirement that politicians' campaign committees disclose the donors and amounts becomes useless.

The Supreme Court has yet to determine what "coordination" means. Is the scope of permissible regulation limited to groups that advocate the election of particular candidates, or can government also regulate coordination of contributions and speech about political issues, when the speakers do not expressly advocate any person's election? What if the speech implies, rather than expresses, a preference for a particular candidate's election? If regulation of coordination about pure issue advocacy is permissible, how tight must the link be between the politician's committee and the advocacy group? Uncertainty is a powerful reason to leave this litigation in state court, where it may meet its end as a matter of state law without any need to resolve these constitutional questions.

The district court thought that the Supreme Court will overrule what remains of *Buckley*, as some Justices have pro-

posed. See, e.g., *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604, 635–40 (1996) (Thomas, J., dissenting in part). If the Constitution forbids all regulation of campaign contributions, there is no basis for regulating coordination either. After all, the rationale for regulating coordination has been to prevent evasion of contribution limits and ensure the public identification of persons who contribute to politicians' war chests. Yet although the Court's views about the proper limits of campaign-finance regulation continue to change, see *Citizens United* (overruling part of *McConnell*) and *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) (overruling a portion of *Buckley* that dealt with aggregate contribution limits across multiple candidates), it has yet to disapprove the portion of *Buckley* holding that some regulation of contributions to candidates is permissible. Justice Thomas wrote separately in *McCutcheon*, 134 S. Ct. at 1462–65 (concurring in the judgment), precisely because a majority was unwilling to revisit that aspect of *Buckley*.

The district court's belief that a majority of the Court eventually will see things Justice Thomas's way may or may not prove correct, but as the Supreme Court's doctrine stands it is not possible to treat as "bad faith" a criminal investigation that reflects *Buckley*'s interpretation of the First Amendment. Nor does it help plaintiffs to accuse defendants of "retaliation". That just restates the point that campaign-finance regulation concerns speech; it does not help to decide whether a particular kind of regulation is forbidden. Cf. *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009).

What we have said shows not only that an injunction was an abuse of discretion but also that all defendants possess qualified immunity from liability in damages. Public officials

can be held liable for violating clearly established law, but not for choosing sides on a debatable issue. See, e.g., *Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges … disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."). The district court thought the law clearly established because, after all, the First Amendment has been with us since 1791. But the right question is what the Constitution means, *concretely*, applied to a dispute such as this. The Justices forbid the use of a high level of generality and insist that law is not "clearly established" until "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). See also, e.g., *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Wood v. Moss*, 134 S. Ct. 2056 (2014).

Plaintiffs' claim to constitutional protection for raising funds to engage in issue advocacy coordinated with a politician's campaign committee has not been established "beyond debate." To the contrary, there is a lively debate among judges and academic analysts. The Supreme Court regularly decides campaign-finance issues by closely divided votes. No opinion issued by the Supreme Court, or by any court of appeals, establishes ("clearly" or otherwise) that the First Amendment forbids regulation of coordination between campaign committees and issue-advocacy groups—let alone that the First Amendment forbids even an *inquiry* into that topic. The district court broke new ground. Its views may be vindicated, but until that day public officials enjoy the benefit of qualified immunity from liability in damages. This makes it unnecessary for us to consider whether any defendant also enjoys the benefit of absolute prosecutorial immunity, which depends on the capacities in which they may

have acted at different times. See *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993).

Finally, we must address a dispute between the litigants and several intervenors, who asked the district judge to disclose (the Reporters Committee for Freedom of the Press, among others) or conceal (Unnamed Intervenors No. 1 and No. 2) documents that have been gathered during the John Doe proceeding and filed in federal court. The district judge ordered eight particular documents to remain under seal and reserved decision on others. 2014 U.S. Dist. Lexis 83456 (E.D. Wis. June 19, 2014). The Reporters Committee appealed. Our jurisdiction, based on the collateral-order doctrine, see *United States v. Blagojevich*, 612 F.3d 558, 560 (7th Cir. 2010); *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 895–96 (7th Cir. 1994), is limited to those eight documents.

The Reporters Committee invokes the presumption of public access to all documents that may have influenced a federal court's decision. See, e.g., *Greenville v. Syngenta Crop Protection, LLC*, No. 13-1626 (7th Cir. Aug. 20, 2014); *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544 (7th Cir. 2002). The Unnamed Intervenors, who are subjects of the John Doe inquiry, invoke the presumption that documents gathered as part of a grand jury investigation remain confidential, see *United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983); *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211 (1979), and with good reason they treat a John Doe proceeding as functionally equivalent to a federal grand jury investigation. Plaintiffs O'Keefe and Club for Growth invoke the rule that private advocacy organizations and their contributors often are entitled to anonymity, lest public

disfavor unduly raise the cost of speech. See *NAACP v. Alabama*, 357 U.S. 449, 462–63 (1958); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009).

The analogy to grand jury proceedings is the strongest of these three. The Supreme Court wrote in *Sells Engineering*: "We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings. … [I]f preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution." 463 U.S. at 424, quoting from *Douglas Oil*. But we do not think that any of the three analogies is dispositive.

Once again, federalism supplies the reason. The documents that the litigants want to disclose, or conceal, were gathered as part of a state proceeding. Wisconsin, not the federal judiciary, should determine whether, and to what extent, documents gathered in a John Doe proceeding are disclosed to the public. See *Socialist Workers Party v. Grubisic*, 619 F.2d 641, 643 (7th Cir. 1980) ("federal common law … accords at least a qualified privilege to the records of state grand jury proceedings"). Otherwise the very fact that someone chose to complain, in federal court, about the conduct of an ongoing state investigation would defeat the state interest in secrecy, even if the federal court concludes—as we have done in this opinion—that the controversy does not belong in federal court. It is easy to file complaints and drop documents into the federal record, but overcoming a state-

law privilege for investigative documents requires more than that. Otherwise state rules would be at every litigant's mercy.

The state court entered a comprehensive order regulating disclosure of documents in the John Doe proceeding. (It also issued a gag order, forbidding subpoenaed parties to talk about what was happening, but no one has challenged that order, and we do not address its propriety.) Wisconsin's judiciary must decide whether particular documents gathered in the investigation should be disclosed. The district court should ensure that sealed documents in the federal record stay sealed, as long as documents containing the same information remain sealed in the state-court record.

The injunction is reversed. The district court's order rejecting the immunity defense is reversed. The district court's order maintaining eight documents under seal is affirmed. The case is remanded with instructions to dismiss the suit, leaving all further proceedings to the courts of Wisconsin.